Anthony TAMILIO, Petitioner,

v.

Walter FOGG, Superintendent, Eastern Correctional Institution, Robert Abrams, Attorney General of the State of New York, Respondents.

No. 79 CV 2222 (ERN).

United States District Court, E. D. New York.

Aug. 26, 1982.

Albert J. Brackley, Brooklyn, N.Y., for petitioner.

Eugene Gold, Dist. Atty., Kings County, Brooklyn, N.Y. by Laurie S. Hershey, Michael Gore, Asst. Dist. Attys., Brooklyn, N.Y., for respondents.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Petitioner, a State prisoner serving concurrent terms of imprisonment of 25 years to life imposed following his conviction on two counts of felony murder, has applied for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. His conviction was affirmed by the Appellate Division, Second Department, with an opinion, *People v. Santanella,* 63 A.D.2d 744, 405 N.Y.S.2d 284 (2d Dept. 1978), and leave to appeal to the Court of Appeals of the State of New York was denied. A petition for a writ of certiorari in the United States Supreme Court was also denied, 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979), with Justices Brennan and Marshall noting that they would grant certiorari. Petitioner has exhausted all available State court remedies.

The sole claim raised is that petitioner's conviction was obtained in violation of his Sixth Amendment right to be confronted with the witnesses against him as established in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Petitioner and two co-defendants, John Cappiello and Ralph Santanella, were tried jointly—petitioner's several motions for a severance having been denied—for the felony murder of an elderly couple, Joseph and Angelina Tucci, which occurred during a burglary and robbery in their home on August 10, 1976. Petitioner was 15 years old at the time of the crime. Although petitioner's co-defendants did not testify at trial, he did so, denying guilt and offering evidence in an attempt to establish that, while he was at the Tucci home with his co-defendants on the morning of August 10, 1976, he was there on an errand for his father and the Tuccis were alive when he left.

Petitioner asserts he was deprived of his right of confrontation by the admission into evidence of the unredacted confessions or statements of his co-defendants, which placed primary responsibility for the murders on him. The trial court's rulings denying him a separate trial were based on the "interlocking confession" exception to the rule of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), see *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979); *United States ex rel. Catanzaro v. Mancusi,* 404 F.2d 296 (2d Cir. 1968), *cert. denied,* 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970); *People v. McNeil,* 24 N.Y.2d 550, 301 N.Y.S.2d 503, 249 N.E.2d 383, *cert. denied,* 396 U.S. 937, 90 S.Ct. 282, 24 L.Ed.2d 236 (1969), despite the fact that petitioner denied before the jury making the "confession" relied upon to invoke the doctrine and offered corroboration in support of his denial. He claims it was prejudicial error to deny him the right

to cross-examine his co-defendants concerning their confessions or statements which implicated him as a participant in the crime.

Although the jury convicted all the defendants of felony murder, the Appellate Division granted new trials to petitioner's two co-defendants on the ground that the trial judge's improper instructions had denied them the benefit of the "non-killer" affirmative defense applicable in felony murder cases. The court said this error was not relevant to petitioner, however, because he "did not rely upon, and the evidence as against him did not suggest the availability of, the affirmative defense." 405 N.Y.S.2d at 288.

More significantly, petitioner was denied a new trial on the *Bruton* point urged here, even though the Appellate Division observed that Tamilio's "own statement does not clearly implicate himself as the actual murderer . . . [and] to that extent, . . . does not interlock with and support those of his codefendants," 405 N.Y.S.2d at 288, who repeatedly had asserted it was petitioner who did the killing. Reasoning that to convict petitioner on the charge of felony murder required the prosecution to show only that he participated in the underlying felony, not that he committed the murders, and that "to that extent" petitioner's statement had interlocked with and supported those of his co-defendants, the court held that

> "so much of the statements of Santanella and Capiello as characterized Tamilio as the actual murderer was extraneous to the question of Tamilio's guilt or innocence of felony murder. Therefore, those portions of the codefendants' statements could not have been prejudicial to Tamilio, and it was unnecessary that such portions of those statements interlock with and be supported by a statement by him." 405 N.Y.S.2d at 288.

The evidence on which the defendants were convicted for the felony murders of the Tuccis is summarized below. Considering the record and arguments of counsel, the Court is of opinion that unless petitioner is granted a new trial within 60 days, the writ must be granted.

The prosecution's theory of the case was that the defendants acted together and killed the Tuccis during the course of a burglary and robbery. In its direct case, the prosecution introduced by petitioner's count no fewer than nine out-of-court statements made by his co-defendants to third persons placing primary responsibility for the murders on petitioner. Although the statements were admitted with limiting instructions to the jury that they could only be considered against the person who made them, the court denied petitioner's motion to redact the statements so as to exclude any references to him. The prosecution also introduced two statements allegedly made by petitioner, one of which served as the basis for application of the interlocking confession doctrine.

Following the introduction of evidence that the victims were found on August 12, 1976, and had died of multiple blunt force injuries to the head, Lorraine Frasca, a neighbor, testified that on August 10, 1976, at approximately 11:00 a.m., she observed a single car parked on the "wrong side" of the street near the Tuccis' house and saw two boys coming from an alleyway alongside the house. She identified petitioner and Santanella as the boys she observed and noted that a third boy remained in the back seat of a green station wagon parked nearby, license number 729 KUE, which she remembered because her son's birthday was July 29. She also testified to a prior lineup identification in which she picked petitioner from six individuals.

Several tellers at the Dime Savings Bank testified. Timothy O'Neill said he was presented a bankbook in the names of Joseph and Angelina Tucci on August 10, 1976. He saw petitioner at the bank and later identified him at a lineup. Maria Pimenta also testified she saw petitioner at the Dime Savings Bank on August 10. Finally, Virginia Dunphy stated petitioner presented a bankbook in the name of Tucci on August 10, 1976, and that she also picked petitioner out of a six man lineup. An expert in fingerprint identification testified that a photograph of a fingerprint found on

the bankbook compared closely with the fingerprint chart of petitioner.

Russell Cunningham testified that he was a friend of Cappiello, that Cappiello told him that he, Santanella, and petitioner went to the Tucci house to search for money; that Cappiello had run out of the house "in shock" after he saw petitioner hitting the "old people" with a "hammer or something;" and that petitioner told Cappiello to "finish off" one of the old people but Cappiello refused.

Frank Serpico then testified to a conversation he had with Santanella on August 12, 1976, during which Santanella said he had participated in a robbery in which two people were killed; that Santanella told him he went to the Tucci house with Cappiello and petitioner, using his mother's car, and that, once at the house, they tied up the two old people, searched the house and petitioner killed the old lady.

The next prosecution witness, Glen Reinhold, testified to a conversation he had with Cappiello on August 12th or 13th. He said Cappiello told him he came into the house after the people had been killed; that Santanella and petitioner went into the house first and killed the old woman and petitioner told Santanella to finish off the man.

Michael Nogaro testified he was in a car with Cappiello and Cunningham on August 10, 1976, when Cappiello recounted the story of the murders. He also testified that Cappiello went out of the house after petitioner struck the old lady with "a tool or a hammer."

John Washington, a fellow prisoner of petitioner's in a Criminal Court Building holding pen, testified to a statement made to him by petitioner—and the critical one for purposes of his claim—on August 18, 1976. Washington stated he was alone with petitioner in the holding pen for a few minutes when he asked petitioner what he was in for and petitioner replied that he and two "buddies" were in for homicide but that he was not caught at the scene of the

crime and therefore he was not scared. He said the robbery netted "a ring and a few grand." [1] Washington further testified that petitioner also told him they ransacked the house and that when the old lady began to scream he hit her with a "gun butt;" and that petitioner said he was going to give Cappiello "five grand" to "put it on" Santanella.

Washington acknowledged that he was a friend and cellmate of Santanella and also testified to statements made by Santanella that placed primary responsibility for the crimes on petitioner. Washington's cooperation with the police concerning the Tucci murders did not begin until October 31, 1976, approximately two and a half months later. Petitioner later denied making the statements Washington attributed to him.

Finally, the prosecution called Detective Kilcullen, who testified as to the scene of the crime, the lineups and identifications made, and oral statements made by Cappiello and petitioner. He stated he visited petitioner's father's garden and nursery on August 14, 1976, and petitioner informed him that he had last seen Santanella on August 10, 1976, when he, Santanella and Cappiello had been driving in Santanella's mother's car. Kilcullen also testified to statements Cappiello gave him, after being advised of his rights, and subsequently gave to an Assistant District Attorney on the evening of August 14, 1976. The statements were detailed and a complete account of Cappiello's version of the murders and directly implicated petitioner in the crime. Cappiello admitted seeing petitioner strike the lady, stated they "did it" and took a bankbook and a ring. He also admitted that he and petitioner took the bankbook to the Dime Savings Bank, Kings Plaza, but threw the book away when the teller refused to give them any money.

The defense case consisted of the testimony of a number of witnesses called to demonstrate that the Tuccis were alive at some

---

1. The witnesses Cunningham, Serpico and Nogaro also testified that they were told a ring was taken from the house.

time later in the day on August 10, 1976, although they failed to establish that the Tuccis were alive at any specific time on that date. A Department of Corrections captain produced records of August 18, 1976, which indicated that petitioner and Washington could have been together on that date, but that it was unlikely they could have been alone, as Washington testified. Petitioner's father next testified that he had bought cement pots from Joseph Tucci for his nursery and that his son had offered to pick them up in a friend's station wagon on the morning of August 10, 1976. He testified that he did not see his son between 10:00 a.m. and noon on that date but did so about 2:30 to 3:00 p.m., when petitioner told him the pots were not ready. Finally, petitioner testified in his own behalf.

Petitioner stated he went to the Tuccis on the 10th in Santanella's mother's station wagon to pick up cement pots for his father and that Cappiello stayed in the car when they went inside. The pots were allegedly too heavy for the car and they left. Petitioner further testified he went to Kings Plaza in the afternoon and happened to meet Cappiello there, who asked him to help take money out of the bank for him. Petitioner said he presented a note to a teller stating he was related to the person named on the bankbook but testified he did not know the name on the book. The teller refused to give him the money. Petitioner denied ever seeing or speaking with John Washington and denied any involvement in the crime.

On cross-examination, petitioner responded that he was quite surprised to meet Cappiello at Kings Plaza on August 10th and denied having been driven to Kings Plaza by Mrs. Santanella. This latter testimony was in flat contradiction to Mrs. Santanella's testimony on the prosecution's direct case, when she stated that petitioner came to her house at approximately 9:30 a.m. on the 10th and that she drove her son to a dentist's appointment at 11:15 a.m., and also drove petitioner and Cappiello from her house to Kings Plaza, where she left them. After her son's appointment, she left Santanella near Kings Plaza.

In seeking to overturn his State conviction petitioner relies on the federal constitutional arguments he previously raised on his State appeal. In addition, relying on the subsequently decided case of *Parker v. Randolph, supra,* petitioner raises the novel legal contention, to which the Court turns first, that the "interlocking confession" exception to *Bruton* which the State court invoked to justify admission of the statements made by non-testifying co-defendants is inapplicable in cases where, as here, the incriminated defendant challenges the making of his confession before the jury. In *Parker,* the State urged the Supreme Court to follow the reasoning of the Court of Appeals for the Second Circuit in *United States ex rel. Catanzaro v. Mancusi, supra,* 404 F.2d 296, 300, which held the *Bruton* rule inapplicable "[w]here the jury has heard the defendant's own [interlocking] confession." This rule is also followed by New York State courts. See, *e.g., People v. Safian,* 46 N.Y.2d 181, 413 N.Y.S.2d 118, 385 N.E.2d 1046 (1978); *People v. McNeil, supra.* In a plurality opinion, the Supreme Court agreed in *Parker* that admission of the interlocking confessions at the joint trial did not infringe respondents' right of confrontation but purported to "cast the issue in a slightly broader form than that posed by [the State]." 442 U.S. at 72, 99 S.Ct. at 2139.

Petitioner here concedes that the Court's plurality opinion, while not definitively settling the issue, leaves the interlocking confession doctrine of the Second Circuit and State of New York intact. He contends, however, that the *Parker* plurality limited its application to cases where the incriminated defendant has made an extra-judicial "admission of guilt" which "stands before the jury unchallenged." *Parker v. Randolph, supra,* 442 U.S. at 73, 99 S.Ct. at 2139 (Rehnquist, J.). Applying this limitation, petitioner argues that the trial court committed prejudicial error in denying his motions for a severance and redaction of any reference to him in the co-defendants' statements, since he denied before the jury

making the confession to Washington, upon which the court relied in invoking the interlocking confession rule, and undermined Washington's testimony with evidence that, he claims, cast doubt on that portion of his testimony which placed him alone with petitioner in a criminal court pen on August 18, 1976.

Confronting petitioner's arguments on the merits, respondents contend that petitioner has misapprehended the language of the *Parker v. Randolph* opinion and the plurality's holding. Petitioner bases his contention on the following:

> "The right protected by *Bruton*—the 'constitutional right of cross-examination,' *id.,* [391 U.S.] at 137, 88 S.Ct., at 1628—has far less practical value to a defendant who has confessed to a crime than to one who has consistently maintained his innocence. Successfully impeaching a co-defendant's confession on cross-examination would likely yield small advantage to the defendant whose own admission of guilt stands before the jury unchallenged." 442 U.S. at 73, 99 S.Ct. at 2139.

Respondents point out that these observations, which form part of the plurality's review of the *Bruton* rule and its foundation in the sixth amendment right of confrontation, precede the passage which actually states the plurality's holding:

> "When, as in *Bruton,* the confessing co-defendant has chosen not to take the stand and the implicated defendant has made no extrajudicial admission of guilt, limiting instructions cannot be accepted as adequate to safeguard the defendant's rights under the Confrontation Clause. Under such circumstances, the 'practical and human limitations of the jury system,' *Bruton v. United States, supra,* [391 U.S.] at 135 [88 S.Ct. at 1627], override the theoretically sound premise that a jury will follow the trial court's instructions. But when the defendant's own confession is properly before the jury, we believe that the constitutional scales tip

the other way. The possible prejudice resulting from the failure of the jury to follow the trial court's instructions is not so 'devastating' or 'vital' to the confessing defendant to require departure from the general rule allowing admission of evidence with limiting instructions. We therefore hold that admission of interlocking confessions with proper limiting instructions conforms to the requirements of the Sixth and Fourteenth Amendments to the United States Constitution." 442 U.S. at 74–75, 99 S.Ct. at 2139–2140.

The parties have closely debated what the reference to an admission of guilt standing before the jury "unchallenged" signifies. Respondent suggests it means only "legal" challenges, for example, on grounds of voluntariness or violations of rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Petitioner disputes that interpretation, contending it renders illogical the earlier allusion to "one who has consistently maintained his innocence," since "legal" challenges are typically made without reference to the question of guilt or innocence. He urges the Court to construe the *Parker* plurality opinion as limiting the interlocking confession doctrine to defendants who have in fact confessed, thus excluding cases such as his where a "factual" challenge is launched to the actual making of the confession. He finds support for his interpretation in Justice Stevens' dissent, which charges the plurality with creating an exception to *Bruton* whenever "there is evidence that the defendant has also made inculpatory statements *which he does not repudiate at trial.*" 99 S.Ct. at 2144 & n. 2 (emphasis supplied).

Although petitioner's arguments have appeal at first blush, they must be rejected. His position would permit any defendant whose statements or confessions had been placed before the jury to obtain a severance or reversal on appeal, in cases in which co-defendants' statements have been admitted on an "interlocking" confession theory, simply by disclaiming his own con-

fession. Such a result, of course, is untenable.[2]

Moreover, the plurality opinion in *Parker* cannot be construed as creating the limitation on the "interlocking" confession doctrine petitioner urges. As the State points out, the actual holding of the case is that admission of interlocking confessions with proper limiting instructions conforms to the requirements of the sixth and fourteenth Amendments. Certainly the plurality could not have intended the broad limitation petitioner perceives in other language in the opinion. As a practical matter, the limitation could easily swallow the exception to the *Bruton* rule that petitioner concedes remains the law in this circuit.

Although petitioner must fail in his effort to narrow the plurality holding in *Parker v. Randolph,* and with it this circuit's rule developed in *United States ex rel. Catanzaro v. Mancusi, supra,* he has raised a far more troubling and substantial issue by renewing a contention from his State appeal. He points out that his disputed statement to Washington and those made by his co-defendants were not enough alike for the State courts to hold that they truly "interlocked" and thus were outside the protective scope of *Bruton,* and within the general rule that jury instructions will suffice to avert any prejudice without need for severed trials or redacted statements. What is most troubling about the case is that throughout the trial, by reason of the admission of the unredacted statements of petitioner's co-defendants, the jury was repeatedly reminded of the baneful fact that two of the three defendants on trial before them for murder named the third, petitioner, as the killer without petitioner having the opportunity to test the truth of the assertions by cross-examination. Concededly, the statements partially "interlocked" as to petitioner's participation in the underlying felony. Nevertheless the Court cannot ignore the clear possibility that the substan-

tial prejudice which must be recognized to have accrued to petitioner from the plain *Bruton* error committed with respect to his guilt or innocence as a "killer participant" under the trial judge's instructions, spilled over to the jury's consideration of the alternative ground of petitioner's "mere participation" in the underlying felony. Thus, although petitioner's "confession" to Washington "interlocked" with his co-defendants' statements as to petitioner having played at least this lesser role, the improper singling out of petitioner as the killer presented the jury with such clearly damning information that the *Bruton* error must be held to have permeated the jury's consideration of petitioner's guilt or innocence as a "mere" participant in the felony as well, despite the trial judge's limiting instructions.

The interlocking confession cases in this circuit, where the doctrine developed, provide only a general guide to decision in this case. Indeed, they only confirm how far from ordinary the facts of this case have marked it and, consequently, why error under *Bruton* that was not harmless beyond a reasonable doubt must be held to have occurred.

Determining whether confessions or statements "interlock" is inherently a largely factual process, the object of which has been well explained in terms of the doctrine's rationale. Under *Bruton,*

"error of constitutional dimensions does not inevitably occur if the questioned confession is admitted under proper instructions from the court concerning its limited use and purpose. The likelihood of error must be measured against the prejudicial consequences of the failure to follow the court's instructions, *i.e.,* the 'devastating' effect of the incriminations contained in the codefendants' admissions. [See *Bruton,* [391 U.S.] at 136 [88 S.Ct. at 1628].] Where the confession adds nothing to what is otherwise clearly and prop-

---

**2.** *Cf. Felton v. Harris,* 482 F.Supp. 448, 456 (S.D.N.Y. 1979), decided after *Parker v. Randolph,* in which Judge Weinfeld held there was no *Bruton* violation in admitting the confession of a nontestifying co-defendant under the inter-

locking confession doctrine where the defendant unsuccessfully testified to vitiate the force of his own incriminating statements by denying their truth.

erly in the case, it can have little 'devastating' effect.

"This situation would clearly obtain were the defendants to voluntarily sign identical confessions. However, since confessions are rarely maternal twins, the court must look to their substance to see whether they interlock sufficiently on vital points to indicate a common genesis. If they do, 'devastating' effects do not follow from their admission."

*United States ex rel. Stanbridge v. Zelker,* 514 F.2d 45, 48–49 (2d Cir.), *cert. denied,* 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975). *Accord, Parker v. Randolph, supra,* 442 U.S. at 72–75, 99 S.Ct. at 2138–2140 (plurality).

Contentions that a defendant's confession or statement does not interlock with and support that of a nontestifying co-defendant have rarely succeeded. An exception is *United States v. Castello,* 426 F.2d 905, 907 (2d Cir. 1970), where the denial of a motion to vacate a conviction under *Bruton* was reversed because the defendant's "bare statement" testified to at trial by another was that he had planned a robbery of the bank that was robbed, while the co-defendants' "interlocking" confessions had "detailed efforts of the [defendant] after the crime was consummated."

More usual are cases like *United States ex rel. Duff v. Zelker,* 452 F.2d 1009 (2d Cir. 1971), and *United States ex rel. Ortiz v. Fritz,* 476 F.2d 37 (2d Cir. 1973). In *Duff,* the defendant's confession differed in that he stated he had walked from the car "the other way" from the liquor store he was charged with robbing, while his co-defendants had stated that he walked from the car to the store with the two who performed the robbery. In other statements, however, the defendant had acknowledged to detectives that he had agreed to participate in the robbery and act as lookout. Considering the defendant to have confessed "to essentially the same facts" as the co-defendants the court held that in light of the defendant's undisputed presence at the robbery, the co-defendant's statements placing him with the robbers themselves "were not a 'vitally important part of the prosecution's case' against him." 452 F.2d at 1010 (citation omitted).

In *Ortiz,* the court rejected a contention that confessions by the habeas petitioner and his co-defendants, his brother Alfredo and one Valencia, were not interlocking because that of Alfredo did not cover the slaying itself and Valencia's put the crime nine hours later than the other two. These differences did not detract from the significant, interlocking aspects of the confessions. "As to motive, plot and execution of the crime they are essentially the same." 476 F.2d at 39. Significantly, however, the court emphasized that there is no "content of the codefendants' confessions that implicates [defendant] in the commission of the crime more than does his own confession— in fact, of the three his own is the most significant." See also *United States ex rel. Smith v. Montanye,* 505 F.2d 1355, 1359–60 (2d Cir. 1974) (admission of statements by co-defendant describing defendant's meeting with two others, at which defendant acknowledged having stabbed the victim, held not in violation of *Bruton* where the two others testified as to the meeting and the defendant's statements; "the content of [the co-defendant's] statements is substantially identical to that of two other testifying witnesses and does not implicate petitioner any more in the commission of the crime than does their independent testimony which was subject to full cross-examination").

This theme was developed further in *United States ex rel. Stanbridge v. Zelker, supra,* 514 F.2d 45. The Court of Appeals there reversed the district court's grant of habeas corpus relief and overturning of a State manslaughter conviction on the ground that *Bruton* had been violated because there were "significant differences" between the confessions of the habeas petitioner and his co-defendant. These related to the petitioner's knowledge that his co-defendant, who did the killing, possessed or intended to use a dangerous weapon. Citing *Ortiz, supra,* the court said the asserted differences were "irrelevant to any of the

elements of the crime of manslaughter of which petitioner was convicted.... There was nothing in [the co-defendant's] confession that implicated petitioner any more in the commission of this crime than did his own confession." 514 F.2d at 49–50. Significantly, the trial judge's instructions did not require the jury to find the defendant knew the co-defendant had a shotgun in order to convict but only that he participated in a conspiracy in the furtherance of which the shooting occurred. As to that, the defendant's statements "standing alone" were sufficient to sustain the conviction. 514 F.2d at 50.

■ The foregoing cases hold essentially that there is no error under *Bruton* where the content of the co-defendants' statements adds nothing significant to the statements made by the defendant. In none of them, however, was there presented the problem that makes this case troublesome. The statements here interlock only in part, and the point on which they diverge, and where *Bruton* error is plain, is on the enormously potent issue of petitioner's role as the killer.

Confronted with petitioner's arguments on the point, the Appellate Division clearly recognized the existence of potential *Bruton* error by ruling that petitioner's statement to Washington did not completely "interlock" with those made by his co-defendants because the statements conflicted as to petitioner's role as the killer. The statements of Cappiello and Santanella implied and asserted that Tamilio killed the Tuccis but "Tamilio's own statement [did] not clearly implicate himself as the actual murderer." 405 N.Y.S.2d at 288.

■ On federal habeas review of a State court conviction, factual determinations of the State courts are presumed correct, even when made by an appellate court. See *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); 28 U.S.C. § 2254(d). This Court cannot say that the record does not fairly support the Appellate Division's determination as to how far "confessions" of petitioner and his co-defendants interlock. Certainly the record does not provide convincing evidence that this factual determination is in error.[3]

Nevertheless, the Appellate Division held that reversal and a new trial were not required. It said that it was unnecessary that the portions of the co-defendants' statements incriminating petitioner as the killer completely "interlock with" and be supported by petitioner's confession, since in its view those portions "could not have been prejudicial to him." 405 N.Y.S.2d at 288. The court reasoned that the characterizations of petitioner as the killer contained in those statements were "extraneous to the question of [petitioner's] guilt or innocence" of felony murder. *Id.* Under the cases, the court implicitly accepted that the portions of the description petitioner allegedly gave Washington about striking Mrs. Tucci during the robbery to silence her, and the supposed "take," which interlocked with and supported other portions of the statements of the co-defendants, were equally damaging to petitioner under the trial court's instructions as the co-defendants' description of him as the "killer participant," notwithstanding that petitioner denied having made the statement and plausibly explained his presence at the Tucci home and presentation of the passbook at the Dime Savings Bank.[4]

3. Although the present argument was not as fully developed in petitioner's State appeal brief, the Appellate Division's treatment of the "interlocking" aspect of the case amply satisfies any doubts regarding exhaustion of remedies. *Cf. Mitchell v. Smith*, 633 F.2d 1009, 1011 (2d Cir. 1980), *cert. denied*, 449 U.S. 1088, 101 S.Ct. 879, 66 L.Ed.2d 814 (1981) (comity does not require that federal court give greater deference to State procedural rules than State courts do themselves).

4. The court stated that "[s]ince the indictment charged Tamilio with felony murder, his conviction on those counts flowed automatically from the prosecution's showing that he participated in the underlying felony, during the course of which one of the defendants caused the deaths of the Tuccis." *People v. Santanella*, 63 A.D.2d 744, 405 N.Y.S.2d 284, 288 (2d Dept. 1978). It is unclear from this statement whether the court held there was no *Bruton* error at all, as the reasoning of *McNeil, supra*, in following the Second Circuit *Catanzaro* deci-

The content of the incriminating statements made by petitioner's co-defendants, however, stands in the way of such an easy solution. First, the identification of petitioner as the murderer was never wholly "extraneous" to petitioner's guilt or innocence of felony murder. Of course, it was not necessary for the prosecution to show petitioner was the murderer. Yet that was the conclusion the prosecution clearly invited the jury to draw about petitioner from Cappiello's statements.[5] In addition, the trial judge's instructions focused the jury's attention as much on the theory that a defendant would be guilty of felony murder as the "killer participant" as on the theory that any defendant could be convicted of felony murder for merely participating in the underlying felony without having committed the actual murders.[6] The importance of determining whether any of the defendants was in fact a "killer participant" was further brought home by the trial judge's instructions as to the availability of the "non-killer" defense to felony murder.[7]

Clearly, to the extent the jury understood that petitioner could be found guilty if it determined beyond a reasonable doubt that he was a "killer participant," the *Bruton* rule was violated. The statements of the nontestifying co-defendants implicated petitioner on a salient point of the crime charged in the instructions more than his own disputed statement did. If *Bruton* was violated by the jury's consideration of whether petitioner was the "killer participant" depicted by his co-defendants, because the statements did not interlock on this point, there arises the "substantial risk," which *Bruton* recognized, that the jury did not follow the court's limiting instructions but weighed the "devastating" implications of the untested incriminating statements in deciding that petitioner was a "killer participant." It strains any common-sense view of the "probable impact," *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), on the minds of a jury in a murder trial, of an identification of a defendant as the murderer by his co-defendants, to hypothesize that the jury could ignore the picture of petitioner as the killer put immediately before them by the co-defendants' statements, and instead rest their conviction upon the less brutal (though legally equally culpable) facts that he participated in the robbery and hit Mrs. Tucci.

The problem is clearly one of prejudicial spill-over of a *Bruton* violation. The prejudicial consequence of the jury's failure to follow the court's instructions is that they would consider petitioner was the "killer participant" depicted by his co-defendants. With that picture fixed in their minds they could not fairly have considered petitioner's guilt based on his mere participation in the underlying felony.

The observations of Justice Blackmun, concurring in the result in *Parker v. Randolph, supra,* bear directly on the kind of "spill-over" prejudice that occurred in this case. It was Justice Blackmun's view, joined in by the three dissenting justices, see 442 U.S. at 81, 99 S.Ct. at 2143, not to

"depart from the harmless error approach in interlocking confession cases. The fact that confessions may interlock to some degree does not ensure, as a *per se* matter, that their admission will not prejudice a defendant so substantially that a limiting instruction will not be curative. The two confessions may interlock in part only. Or they may cover only a portion of the events in issue at the trial. Although two interlocking confessions may

---

sion, would indicate, or whether any *Bruton* error was harmless beyond a reasonable doubt.

To the extent that the court first looked to other evidence besides petitioner's confession to gauge the effect of the claimed wrongful admission of the co-defendants' confessions, it would have adopted a harmless error approach seemingly inconsistent with the *Parker v. Randolph* plurality and case law in this circuit and New York State. The point, however, is not critical.

**5.** See Tr. at 2271–75.

**6.** See Tr. at 2307–09, 2311–12.

**7.** See Tr. at 2323–26.

not be internally inconsistent, one may go far beyond the other in implicating the confessor's codefendant. In such circumstances, the admission of the confession of the codefendant who does not take the stand could very well serve to prejudice the defendant who is incriminated by the confession, notwithstanding that the defendant's own confession is, to an extent, interlocking. I fully recognize that in most interlocking confession cases, any error in admitting the confession of a nontestifying codefendant will be harmless beyond a reasonable doubt. Even so, I would not adopt a rigid *per se* rule that forecloses a court from weighing all the circumstances in order to determine whether the defendant in fact was unfairly prejudiced by the admission of even an interlocking confession. Where he was unfairly prejudiced, the mere fact that prejudice was caused by an interlocking confession ought not to override the important interests that the Confrontation Clause protects." 442 U.S. at 79, 99 S.Ct. at 2142.

Recently, this circuit seems also to have acknowledged the possibility that application of the interlocking confession doctrine may itself be cause for prejudice. In holding that the prosecution "neither sought to argue [one defendant's] guilt from [the co-defendant's] confession nor created any substantial risk that the limiting instruction would be ignored," *Kirksey v. Jones,* 673 F.2d 58, 61 (2d Cir. 1982), the court carefully noted that application of the interlocking confession rule "would have created a greater risk of prejudice" if "independent evidence" had not linked the petitioner to the scene of one of the crimes and if the co-defendant's confession "had incriminated [petitioner] as to a salient point not set forth in [his] own confession." 673 F.2d at 60 n. 2.

Unlike *Kirksey v. Jones,* where apparently no good explanations for the independent evidence of the defendant's role in the crimes was offered, the independent evidence in this case identifying petitioner in the Tucci driveway and with the Tucci bankbook was met by petitioner's admission

that he had been at the Tucci home to pick up cement pots for his father, and had tried to do his friend Cappiello a favor. On the other hand, petitioner was never directly identified as the murderer, even by his own confession. Therefore the incriminating nature of his co-defendants' statements that this was so could only have prejudiced him in the jury's consideration of his guilt or innocence as a participant in the underlying felony. In effect, his role had already been settled.

■ Since there was error under *Bruton* in admitting the confessions of petitioner's co-defendants at their joint trial, the question next arises whether this constitutional error was harmless beyond a reasonable doubt. See *Hendrix v. Smith,* 639 F.2d 113 (2d Cir. 1981). In that case the Court of Appeals drew from *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), and *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the following definitions of harmless error in a *Bruton* situation:

> " 'There is little, if any, difference between our statement in *Fahy v. Connecticut* [375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171] about "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' ( [*Chapman v. California* ] 368 U.S. at 24 [87 S.Ct. at 828] . . . .)

> \*     \*     \*     \*     \*     \*

> " 'Thus, unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required. See *Chapman v. California,* 386 U.S. 18, 24 [87 S.Ct. 824,

828, 17 L.Ed.2d 705] (1967). In this case, we conclude that the "minds of an average jury" would not have found the State's case significantly less persuasive had the testimony as to Snell's admissions been excluded. The admission into evidence of these statements, therefore, was at most harmless error.' [*Schneble v. Florida*] 405 U.S. at 432 [92 S.Ct. at 1059]." 639 F.2d at 115.

The significant vice of the admission of the co-defendants' statements in this case is that their content unfairly refuted petitioner's defense by offering apparently conclusive, yet unexamined corroboration of what Washington testified petitioner had confessed (however improper it was to consider it).[8] By itself, Washington's testimony providing the confession was open to suspicion. A corrections official provided reliable testimony that the conversation could not have occurred in the private manner Washington said. Further, his sharing of a cell with petitioner's co-defendant Santanella and professed friendship for "Ralphie" provided obvious motivations for his testimony. Indeed, Santanella himself could have been the source of Washington's information which the latter supposedly waited almost three months to bring to the prosecution's attention. On the other hand, petitioner denied on the stand that he ever "confessed" to Washington, and offered plausible explanations for the other independent evidence closely linking him to the crime, Mrs. Frasca's identification of him in the Tucci driveway and the bank teller's identification of him with the bankbook. Without petitioner's purported confession, these witnesses provided the prosecution with a probably sufficient but hardly overwhelming circumstantial case against petitioner.

Clearly it was important to the prosecution that the jury accept petitioner's "confession" to Washington as proof of what happened. Essentially, however, the jury had been improperly informed that petitioner's co-defendants had named him the killer, in apparent confirmation of everything Washington told them petitioner had told him. In those circumstances they could not fairly consider petitioner's denial that he ever "confessed" to having participated in the crimes. Since it cannot be said now how the jury might have viewed petitioner's "confession" to Washington, *i.e.*, whether or not they would believe he made it, and since that confession obviously was critical to the prosecution, it cannot be said that the *Bruton* error in this case was harmless beyond a reasonable doubt.

Accordingly, the petition for a writ of habeas corpus will be granted unless petitioner is granted a new trial within sixty (60) days of the date of this Order.

SO ORDERED.

---

**8.** On summation, the prosecutor sought to bolster Washington's version of Tamilio's "confession" by openly inviting the jury to view the co-defendants' statements as corroboration:

"And, you see, if all you had in this case was John Washington, you might say to yourselves, what's going on here, but John Washington is corroborated constantly throughout this case. He is corroborated by Lorraine Frasca. He is corroborated by the bank people. *He is corroborated by the defendant Cappiello's confession. He is corroborated by what Ralph tells him. See, he's corroborated all along the line.*" Tr. at 2284 (emphasis added).