**Anthony TAMILIO, Petitioner-Appellee,**

v.

**Walter FOGG, Superintendent, Eastern Correctional Facility, and Robert Abrams, Attorney General of New York, Respondents-Appellants.**

No. 775, Docket 82–2272.

United States Court of Appeals, Second Circuit.

Argued Jan. 25, 1983.
Decided July 27, 1983.

---

Albert J. Brackley, Brooklyn, N.Y., for petitioner-appellee.

Michael Gore, Asst. Dist. Atty., Brooklyn, N.Y. (Elizabeth Holtzman, Dist. Atty. Kings County, and Barbara D. Underwood, Asst. Dist. Atty., Brooklyn, N.Y., on brief), for respondents-appellants.

Before VAN GRAAFEILAND, PIERCE and WINTER, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

In 1977, appellee Anthony Tamilio and two co-defendants were convicted in New York State Supreme Court of two counts of felony murder, N.Y.Penal Law § 125.25(3) (McKinney 1975). Appellee's conviction was affirmed by the Appellate Division, 63 A.D.2d 744, 405 N.Y.S.2d 284 (1978), and leave to appeal was denied by the New York Court of Appeals, 45 N.Y.2d 784, 409 N.Y.S.2d 1042, 381 N.E.2d 177 (1978). The United States Supreme Court denied certiorari. 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979). On August 26, 1982, the United States District Court for the Eastern District of New York, Neaher, J., granted appellee's petition for a writ of habeas corpus, subject to the State's right to retry the case within sixty days. 546 F.Supp. 364. We reverse.

Appellee, John Cappiello, and Ralph Santanella were charged by the State of New York with the felony murders of an elderly couple, Joseph and Angelina Tucci. According to the prosecution's theory, the murders occurred in the couple's home in Brooklyn on August 10, 1976, during the course of a burglary and robbery by the three co-defendants. The deaths resulted from head injuries caused by blows from a blunt object. The victims' bodies, tied and gagged, were found in their home on August 12.

On the morning of August 10, appellee and Santanella were seen emerging from an alley which ran alongside the Tucci home. Several hours later, appellee attempted unsuccessfully to withdraw $2,500 from the Dime Savings Bank with the use of Mr. Tucci's bank book. Appellee admitted that he was at the Tucci home with his co-defendants on August 10, but contends that he was there on an errand for his father and that Mr. and Mrs. Tucci were alive when he and his co-defendants left. He testified that, through pure happenstance, he met Cappiello later in front of the Dime Savings Bank and was asked by him to attempt the $2,500 withdrawal, posing as Tucci's nephew. Appellee's testimony as to the chance meeting was contradicted by that of Santanella's mother, who swore that she drove the three defendants from her home to the plaza where the Bank was located. Appellee also testified incredibly that, although he had known Mr. Tucci for six years and had been in his home at least fifty times, he did not know that his name was Tucci.

The State introduced evidence that each of the three defendants had admitted or confessed his participation in the crime and had implicated his co-defendants. Each time a witness testified concerning a statement by one of the defendants, the trial court instructed the jury that the statement was to be considered only against the defendant who had made it, and the court repeated these instructions in his charge. Appellee's statement allegedly was made to a fellow prisoner, John Washington, in the holding pen at criminal court.

Washington testified that he and appellee had been alone together in the pen for five to seven minutes, at which time appellee talked to Washington about the crime. Washington testified that appellee told him he and a couple of buddies were in for homicide, but that appellee was not worried because he had not been found at the scene of the crime. According to Washington, appellee said that he and his accomplices had gotten a ring and a few grand, and appellee showed him a newspaper clipping about the crime. Appellee purportedly told Washington that he knew the victims, how to get into their house, and where the money was. Appellee further stated, according to Washington, that he and Cappiello went in and ransacked the place. Appellee told him, Washington said, that when the lady screamed appellee started hitting her across the forehead with the butt of a gun while Cappiello held her. When the lady wouldn't be quiet, appellee "just kept on hitting her."

■ The district court stated that appellee "denied ever seeing or speaking with John Washington", 546 F.Supp. 368, and "denied making the statements Washington attributed to him", *id.* at 367. This was a misreading of appellee's testimony. What appellee actually said was that he didn't remember whether he saw Washington in the bull pen and that he was never alone in a cell with anyone. He never denied making the statement. The district court then proceeded to compare the statements of the three defendants and wound up taking two mutually inconsistent positions. It held, first, that appellee's admissions to Wash-

ington interlocked with those of his co-defendants only to the extent that all statements identified appellee as a participant in the underlying felony of robbery upon which the murder charge was based. *Id.* at 372–73. The district court then reversed its field, stating that appellee's co-defendants had named him the killer "in apparent confirmation of everything Washington told [the jury] petitioner had told him." *Id.* at 375. The district court's second position was correct; the statements of the three defendants interlock on all essential points, particularly on the point which the district court found to be critical, *i.e.,* that it was appellee who bludgeoned Mrs. Tucci. We disagree with the district court's assertion that appellee's admission that he "just kept on hitting" the eighty-two-year-old Mrs. Tucci on the head when she wouldn't keep quiet described a "less brutal" offense (*id.* at 373) than the statements of his co-defendants that appellee killed Mrs. Tucci by hitting her on the head.

■ The interlocking confession exception to the *Bruton* rule, *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to which this Court long has been committed, *see United States ex rel. Catanzaro v. Mancusi,* 404 F.2d 296, 300 (2d Cir.1968), *cert. denied,* 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970), has also been recognized by the Supreme Court, *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). This doctrine does not require identity in statements. *United States ex rel. Ortiz v. Fritz,* 476 F.2d 37, 39 (2d Cir.), *cert. denied,* 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed.2d 482 (1973). It is sufficient if the confessions are "substantially the same and consistent on the major elements of the crime involved." *United States ex rel. Stanbridge v. Zelker,* 514 F.2d 45, 49 (2d Cir.), *cert. denied,* 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975). Essentially, to be interlocking, the statements must describe the same crime. *United States v. Fleming,* 594 F.2d 598, 604 (7th Cir.), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979). The fact that a defendant takes the stand and denies his guilt, thus implicitly repudiating his inculpatory admissions, does not preclude application of

the doctrine. *United States ex rel. Dukes v. Wallack,* 414 F.2d 246, 247 (2d Cir.1969); *Felton v. Harris,* 482 F.Supp. 448, 454–56 (S.D.N.Y.1979); *People v. Woodward,* 50 N.Y.2d 922, 431 N.Y.S.2d 452, 409 N.E.2d 926 (1980).

Assuming for the argument only that the statements in the instant case did not interlock on the issue of who did the actual killing, resolution of that issue was not essential to the State's case. Appellee was convicted of felony murder, a killing by one of the three participants in the Tucci robbery. New York Penal Law § 125.25(3). Since appellee never sought the benefit of the "non-killer" affirmative defense provided for in the New York statute, it made no difference in his case which of the three defendants killed the Tuccis. Proof of appellee's participation in the robbery which culminated in the two killings established his guilt.

The interlocking confession doctrine is closely related to the doctrine of harmless error. We are convinced that, regardless of whether the statements of Santanella and Cappiello qualified as interlocking confessions, their admission constituted harmless error. Our conviction is "based on our own reading of the record and what seems to us to have been the probable impact of the [co-defendants'] confessions on the minds of an average jury." *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). It is undisputed that the deceased, Joseph Tucci, seventy-eight years old, four feet, eleven inches tall, and weighing one hundred fourteen pounds, would not open his door to anyone he didn't know. It is also undisputed that appellee was the only defendant whom Mr. Tucci knew. It is also undisputed that the three defendants were in the Tucci home on the morning of August 10, 1976. It is also undisputed that several hours later appellee attempted to withdraw $2,500 from the Dime Savings Bank, using Mr. Tucci's bank book and posing as his nephew. It is also undisputed that appellee did not return to the Tucci home during the two days before the bodies were discovered to complete the unfinished "errand" which, he claims, took him there on the day of the killing.

These undisputed facts form the solid foundation upon which appellee's admissions to John Washington rest. The statements of appellee's co-defendants added such little to what already was in the case that, even if the jury failed to follow the trial court's limiting instructions which accompanied the admission of each statement, this would not have had a devastating effect on appellee's defense. *United States ex rel. Stanbridge v. Zelker, supra,* 514 F.2d at 48–49. In short, "we conclude that the 'minds of an average jury' would not have found the State's case significantly less persuasive had the testimony as to [the co-defendants'] admissions been excluded." *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972). *See Brown v. United States,* 411 U.S. 223, 230–32, 93 S.Ct. 1565, 1569–70, 36 L.Ed.2d 208 (1973); *United States ex rel. Nelson v. Follette,* 430 F.2d 1055, 1058–59 (2d Cir.1970), *cert. denied,* 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed.2d 818 (1971).

The judgment of the district court is reversed.