Thomas FELTON, Petitioner,

v.

David HARRIS, Superintendent, Green Haven Correctional Facility, Respondent.

No. 79 Civ. 2180.

United States District Court, S. D. New York.

Oct. 31, 1979.

David Blackstone, New York City, for petitioner.

Robert Abrams, Atty. Gen. of N. Y., New York City, for respondent; Andrea G. Iason, Deputy Asst. Atty. Gen., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Petitioner, Thomas Felton, now serving a sentence of 25 years to life at Green Haven Correctional Facility, New York pursuant to a judgment of conviction of the murder in the second degree, of three separate victims, entered upon a jury verdict in the Supreme Court, Bronx County, petitions for his release under a federal writ of habeas corpus. Petitioner's co-defendant, Willie Lee Kirksey, also was convicted at their joint trial of the same charges and received the same sentence. The judgment of conviction was affirmed by the Appellate Division, First Department and leave to appeal to the Court of Appeals was denied. Soon thereafter, petitioner commenced this proceeding upon a claim that his conviction was obtained in violation of his right of confrontation under the Sixth Amendment in that Kirksey's confession, which directly implicated petitioner, was admitted in evidence over his objection, although Kirksey did not testify, as petitioner did.

Before trial, each defendant moved pursuant to *Huntley*[1] to suppress his individual statements or confessions. Each motion was heard separately before State Supreme Court Justice Donald Sullivan who, after extensive testimony, denied each defendant's motion upon specific findings that appropriate *Miranda* warnings were given; that the statements were voluntary; that the People had established beyond a reasonable doubt that each defendant's constitutional rights had not been violated; and that each had made an intelligent waiver. The Court also denied motions made by Kirksey to suppress eyewitness identification evidence pursuant to *Wade*[2] and physical evidence, a school guard crossing shield, obtained during a search of his apartment, pursuant to *Mapp*.[3]

Following the denial of the aforesaid motions, the case proceeded to trial before Judge Sullivan and resulted in the conviction of each defendant of the murders of Elsie Simon, Margaret Doyle and Stella Bloswick, committed during the commission of robbery and other felonies. Several days after petitioner had been sentenced thereon, he pled guilty to manslaughter in the first degree in the killing of another victim, Rose Jocelyn and was sentenced to a term of 8⅓ to 25 years. He also pled guilty to an attempt to commit robbery in the second degree upon one Ethel Dyer and was sentenced to 2⅓ to 7 years. The latter two sentences were to run concurrently with

1. *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

2. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

3. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

those imposed upon the second degree murder convictions.[4]

A series of murders of elderly women were committed between March and September 3, 1975 in Bronx County, New York City, each of which followed a common pattern. The assailants gained entry into apartments by a ruse and when the occupant opened the door she was pushed in and assaulted. The apartment was ransacked for money, jewelry and other valuables and in some instances, the aged woman was raped before she was killed either by violent assault, gagging or strangulation.

### The Kirksey Statements

In the late afternoon of September 5, 1975, as a result of a report of a robbery in the general area of the most recent homicide, Willie Lee Kirksey was apprehended soon after he jumped over a fence of a hospital near the scene of the reported robbery. He was arrested and interrogated by detectives who, it so happened were in the vicinity investigating the murder of Margaret Doyle two days earlier on September 3. Kirksey was told that any leads he could give concerning the homicide might be helpful to him on the instant arrest charge. He mentioned that three of his friends—Tommy, Ronny and Bobby—had disclosed to him that they had "ripped off" an old lady; that when she opened the door of her apartment in response to their knock they pushed her in and she screamed. The detectives, with respect to the Doyle murder, had information that the deceased in fact had screamed. Kirksey's reference to this detail led one of them to suggest "you were there," whereupon, after a moment's reflection, Kirksey admitted he had been and said

he wished to talk because his conscience was bothering him.[5] He agreed to take the detectives to the scene of the homicide.

He led them to 2476 Webb Avenue, Bronx, walked three flights up to an apartment, described the layout before entering, and upon entry gave a detailed account of his and each accomplice's role in, and recounted events leading to, the assault, robbery and murder and how they later divided the proceeds of the crime. He said it was Tommy who pushed her inside when she screamed and then used a pillow as he began punching the struggling 75 year old woman. Margaret Doyle resided and was murdered in that apartment two days earlier. He also mentioned that before they had entered the apartment, using his shirt, he had unscrewed a hallway light bulb so that it would not light. It was the loosened bulb, which the custodian of the building was about to remove, that led to the discovery of the deceased when he checked the door of her apartment.

When asked by the detectives if he had anything to so with any other homicides committed against elderly people, Kirksey stated he had been involved in another, four or five weeks earlier, and named Tommy, Ronny, Bobby and Skip as the other participants. He then led the detectives to a building at 2364 Tiebout Avenue, Bronx, and pointed out a ground floor apartment. It was the scene of the Elsie Simon murder committed on July 29, 1975. In this instance, he said his accomplices went into the building while he waited downstairs in a car; that in about twenty minutes they came running out of the building; and after meeting them at a pre-arranged spot, they told him that they had ripped off an

---

4. The petitioner did not admit the underlying facts but expressed his desire to enter the guilty pleas. The Court, after closely questioning defendant and impressing upon him his right to a trial, accepted the pleas as voluntarily and intelligently entered under the doctrine of *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), noting that "the defendant's claim of innocence has been, in the Court's opinion negated by the proof and strong evidence of actual guilt." Minutes January 14, 1976, p. 32.

5. Kirksey was given the *Miranda* warning in this and other instances when questioned, as was the case when Felton was questioned at various times. As already noted, the Supreme Court Justice so found upon the *Huntley* hearing and the trial evidence abundantly establishes this and no claim is raised with respect thereto. Accordingly, hereafter reference will not be made to each instance when the warning was given.

old woman, tied and gagged her and had gotten some jewelry and money and split the proceeds.

The detectives then returned to the police precinct where Kirksey repeated his versions of the Doyle and Simon crimes and signed a statement summarizing what he had recounted to the detectives. Efforts late that evening to locate the named accomplices, including Tommy, proved fruitless. The detectives, in their quest for those named by Kirksey, were accompanied by him. He pointed out their usual haunts, but they were not to be found.

Upon their return to the police precinct, Kirksey was asked whether or not there were really accomplices and had he acted on his own. He became visibly upset and told detectives he was responsible for a third murder, committed in March 1975, at De Voe Terrace in the Bronx. The homicide, as described by him, had been committed in similar fashion to the Doyle and Simon murders. The victim was pushed into her apartment, assaulted, robbed and killed. Again he directed the officers to an apartment at 2435 De Voe Terrace where Stella Bloswick's dead body was discovered on March 15, 1975.

When they returned to the station house, Kirksey was again asked if in fact he had not committed the crimes by himself. This time he said he had committed the Doyle and Bloswick murders by himself and that Tommy was involved only in the Simon homicide. He also eliminated Ronny, Skip and Bobby as accomplices in any of the murders.[6] Following this reinterview, he repeated his revised version to an Assistant District Attorney that he alone was responsible for the Doyle and Bloswick murders and that he and Tommy committed the murder of Elsie Simon. He stated that he and Tommy entered the Tiebout apartment house on July 29, 1975, and met Elsie Simon as she was leaving her apartment to empty garbage; that they pushed her back into her apartment and he restrained her on the floor while Tommy tied and gagged her, following which they took money and jewelry from a rear bedroom. The question and answer statement was stenographically recorded. Later that morning, Kirksey was arraigned and charged with the three murders.

### Thomas Felton and His Statements

Kirksey's reference to "Tommy" led detectives to believe that he was Thomas Felton, the petitioner. However, it was not until September 17 that contact was made with him. This was effected through Detective William Hoard who was known to be friendly with the Felton family and whose assistance was enlisted in locating Felton by the detectives investigating the murders. Hoard himself was not engaged in any aspect of the investigation into the murders. Hoard left word with James Felton that the investigating detectives desired to interview his son Tommy. Thereafter, Thomas Felton voluntarily appeared on September 17 at the police precinct. He first saw Hoard to whom he denied any knowledge of the crimes. He was later interviewed by the detectives investigating the murders. He was informed of Kirksey's arrest for several homicides and after first stating he did not know who Kirksey was, identified his picture as somebody he knew from the neighborhood. When told that Kirksey had named him as a participant in one of the homicides, he denied he had anything to do with Kirksey with respect to criminal activities. Felton was not detained. In the meantime, the detectives continued their investigation.

On October 3, 1975, Felton, without solicitation, called on the detectives at the station house. He was again given his *Miranda* rights. He told detectives that he worked for a company as a protective gate installer which gave him access to residences; that he was thus in a position to "case" apartments; and that when he went into apartments he looked for valuables and later passed this information on to Kirksey. He told them he had "fingered" three loca-

---

**6.** His explanation: The first time I was kidding around a bit. I was scared the first time. Then the second time we started talking . . . . I just told them everything.

tions; that the Elsie Simon residence was one where he had seen an old lady and valuables in the apartment and subsequently had given this information to Kirksey. He agreed to locate the premises about which he had given the information to Kirksey. He then directed them to the building where the Simon murder occurred and pointed out the window gates on the ground floor apartment he had installed. He next led them to another building where he said he had taken measurements for gates to be installed in an apartment three flights up. This apartment was the scene of the Margaret Doyle murder. Later he identified yet another apartment on De Voe Terrace where he said he had fingered a job. This was the apartment where Stella Bloswick was murdered. He also admitted casing a fourth apartment, that of Rose Jocelyn on University Avenue, Bronx, and later implicated himself in a robbery and burglary there.[7]

Felton acknowledged that he knew the purpose of furnishing the information to Kirksey was robbery and that after each robbery he was paid either 50, 60 or 70 dollars. However, he denied that he was present or knew what had happened at the various apartments when the crimes were committed or that he was informed any of the victims had been injured. He named Jerry Kirksey, Willie's brother and one Kevin McKinley as Willie Kirksey's confederates.

At the station house, he repeated what he had told the detectives and the substance of his statements was recorded by a detective on five pages of notes, each of which he initialed. Later, in the early hours of October 4, he again repeated his earlier statements upon questioning by an Assistant District Attorney and they were stenographically recorded. Later that morning, October 4, he was arraigned in the Criminal Court upon an unrelated robbery charge, to which he had referred during the course of his questioning, and released on low bail.

The decision to lodge this charge against him was based upon three factors: (1) his confession during the preceding night was at that time insufficient to warrant a murder prosecution; (2) the investigation was ongoing; and (3) the prospect that he might be used as a witness against Kirksey.

On October 6, Felton, entirely on his own, called on Detective Hoard, revised his earlier version, volunteering that he was present at the three homicides, but denied he killed anyone. Hoard stopped him from speaking further and advised him of his *Miranda* rights. Hoard then phoned Detective Lyman, one of the investigating team, and arranged an appointment for Lyman and Felton the next day.

Felton failed to keep that appointment. On the evening of October 9, Lyman and another detective called at petitioner's home where he was found hiding in a closet. He agreed to accompany them to the station house, where, at his request, he spoke to his father in privacy for about a half hour. Following this conversation, in the presence of his father, he told the police officers that his prior version about installing or measuring gates was false and that he had not worked during the period of the murders for the gate installing company. He stated that he knew Kirksey for three years and that he was present with Kirksey when the three robberies were committed. He confessed to the murders of Margaret Doyle, Elsie Simon and Stella Bloswick and inculpated himself in the murder of Rose Jocelyn.

He described in detail his role, that of Kirksey and others in the Doyle robbery and murder; the others included Kirksey's brother, Jerry, and one Kevin McKinley. He described how when the quartet got to the floor of the apartment they unscrewed the light bulb in the hallway and that when Kirksey knocked on the door of the apartment he flashed a silver badge to encourage the occupant to open the door wide enough to force entry. He related how, after gain-

---

7. Felton was separately indicted for the murder of Rose Jocelyn and in another indictment for robbery and burglary of another woman who was in the apartment and pled guilty to the latter charges. *See* text accompanying footnote 4 *supra*.

ing entrance, the victim was bound and gagged; how he and the others ransacked the apartment of money, jewelry and valuables; and how they split the money later that night, with Kirksey assigned to "fence" the jewelry and to divide the proceeds.

With respect to the Simon robbery and murder, he also recounted in detail his role, Kirksey's and that of the other confederates. He described how they had stalked the victim for several days before following her from the street on the fatal day to her apartment; how she was pushed into her apartment as she was opening the door, then assaulted, robbed and murdered, and how they later split the spoils.

Similarly, he described in minute detail events leading to the robbery and murder of Stella Bloswick on March 15, 1975; in that instance too, to gain entrance, a school crossing guard shield was displayed when the occupant of the apartment responded to their knock on the door or signal, following which they pushed her into the apartment. He identified for the detectives a school crossing guard shield as similar to the one displayed to the victims. This was the shield obtained during the search of Kirksey's apartment and the subject of his unsuccessful motion to suppress.

Felton also identified a picture of a ring that was part of the loot taken in the Bloswick apartment that he had given to Kirksey and which the latter wore at the time of his arrest. Felton, at the conclusion of this interview, signed and initialed each page of the officer's notes summarizing his statements. Later, starting shortly after midnight on October 10th, he repeated his statement to an Assistant District Attorney which was recorded stenographically on eighty-six pages.[8] This statement was also made in his father's presence.

When Felton named Jerry Kirksey as one of the accomplices, the police immediately went to the Kirksey home where they were informed, and soon verified, that Jerry Kirksey had been imprisoned during the period that Felton named him a participant in the crimes he described. Confronted with this information, petitioner said he wanted to get even with Willie Lee Kirksey because he informed on him. He then substituted his own brother Al for Jerry Kirksey. When the police brought Al Felton to the station house, and the brothers talked privately, Felton retracted, saying he had falsely accused his brother because he didn't want to go to jail alone and wanted somebody who knew him. Thereafter he repeated his final revised statement, that his confederates in the Simon, Doyle and Bloswick murders were Willie Kirksey and Kevin McKinley, to an Assistant District Attorney which also was recorded stenographically.

Upon the trial, in addition to other evidence, each defendant's inculpatory statements and confessions, oral and written, were presented to the jury. Appropriate cautionary instructions were given to the jury that each defendant's statement was received in evidence only as to that defendant and was not to be considered against the other.

Kirksey did not testify. He called as his only witness a psychiatric nurse at the Kingsbridge Veterans Hospital, who testified that Kirksey and his mother were at the hospital on July 29, 1975 between 1:15 and 1:45 p. m. The petitioner did testify. He categorically denied that he knew or had heard of Kirksey prior to October 1975 when questioned about him by the detectives. He denied that he had been in the apartment of the murder victims or that he played any role whatsoever in the crimes. He admitted he made the oral and written inculpatory statements which acknowledged his complicity in each of the three murders, but, despite the minutia of detail, denied the inculpatory statements were true.

He testified that the various statements which detailed his role in the murders were in fact false; that they were drilled into

---

8. This statement was redacted upon the trial to exclude reference to the Rose Jocelyn murder and robbery.

him by the family friend, Detective Hoard. His version was that Hoard, in whom he had confidence, told him that Kirksey had named him as a participant in three or four murders, and when he denied he was involved, Hoard said the authorities had helped him out on the unrelated robbery charge when he was released in low bail and in return asked him to become a state's witness against Kirksey; that Hoard asked him to make a statement to the detectives in charge of the murder investigation. Petitioner testified that Hoard told him what to say with respect to each murder and went over the details of each, giving the locations of each murder scene, the color of an ambulance called to the scene of one of the murders, a description of the school crossing badge and the jewelry he identified that Kirksey wore and had been stolen from one of the apartments. He further testified that he had memorized what Hoard had told him to say until he knew the answers by heart. Felton said that it was upon Hoard's instructions that he included the jailed Jerry Kirksey as a participant in the crimes, and gave the explanation that he included Jerry because he wanted to get at his brother Willie because Willie had named him as a confederate. Felton also testified that Hoard was present each time he made incriminating statements, the oral as well as the written ones, on October 3–4 and October 9–10. Felton admitted he made the confessions as testified to and as set forth in the question and answer recorded statements, but maintained that he simply was parroting what he was told to say—in sum, that his confession was false. Felton's father, with whom he conferred privately before, and who was present when he confessed, was not called as a defense witness.

Detective Hoard categorically denied Felton's charge of a false confession or that he was present when Felton made either his oral inculpatory statements to the detectives or his recorded confessions to the Assistant District Attorneys. The testimony of the State's witnesses was of like tenor. The stenographic question and answer confessions do not list Hoard as present.

Since petitioner does not dispute that he made the incriminating admissions and the confession, if in fact they were voluntary, they constitute the strongest evidence that can be given of the facts stated therein.[9] With the corpus delicti established in the instance of each murder, the guilt of the defendant could be based on his uncorroborated confession.[10] But there is corroborative evidence. Petitioner's detailed information as to each robbery, the ransacking of the apartments, their locations, the role of each participant in the crimes, and the minutia of events leading to each murder was consistent with the independent objective evidence that also was presented to the jury.

On the other hand, if petitioner was innocent of the crimes but merely repeated what was told him upon assurance that this would help him on the unrelated robbery charge against him, then his confession and the inculpatory statements were of no value. Prior to trial, at the *Huntley* hearing, the Judge found that the statements were voluntarily and knowingly made and free from any constitutional taint. This determination is presumed to be correct in this proceeding, and in fact, petitioner has presented no challenge to the validity of that finding.[11] The jury, by its verdict, obviously rejected his version of a planted and false confession.

Against the background of the trial record, we consider petitioner's claim that

---

9. *Hopt v. Utah*, 110 U.S. 574, 585, 4 S.Ct. 202, 28 L.Ed. 262 (1884); *Cramer v. United States*, 325 U.S. 1, 67, 65 S.Ct. 918, 89 L.Ed. 1441 (1945) (Douglas, J., dissenting); *United States v. Mihalopoulos*, 228 F.Supp. 994, 1000 (D.D.C. 1964). Cf. *United States v. Drummond*, 354 F.2d 132, 144 (2d Cir. 1965), *cert. denied*, 384 U.S. 1013, 86 S.Ct. 1968, 16 L.Ed.2d 1031 (1966).

10. *Smith v. United States*, 348 U.S. 147, 156, 75 S.Ct. 194, 99 L.Ed. 192 (1954).

11. 28 U.S.C. § 2254(d). *See also United States ex rel. Stanbridge v. Zelker*, 514 F.2d 45, 51 (2d Cir.), *cert. denied*, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975).

nonetheless the admission of Kirksey's confession violated petitioner's right of confrontation since Kirksey did not testify and thus was not subject to cross-examination, and that as a consequence the judgment of conviction is void.

There can be no question that petitioner's confessions, oral and written, "interlocked" with those of Kirksey, who did not testify. Each one separately described his own particular role and that of his confederates in each murder, and with such detail that only a participant could have known, including, but not limited to, the "fingering" of an apartment occupied by an elderly lady for a planned "rip-off"; the precise location of the apartment; in one instance, the unscrewing of an electric light bulb; in other instances, the use of the school guard badge to gain entry; and once entry was effected, specific acts of assault upon the victim, the ransacking of the apartment in search of valuables, a description of the loot and a subsequent meeting and sharing of the spoils of the crime. The fact that the confessions of each with respect to each separate crime do not jibe in perfection, or indeed that there are some contradictions, is of no consequence.[12] Absolute identical statements are not required. Indeed, it would be remarkable if suspects questioned separately with each seeking to minimize his role in the murders were in precise accord in their recital of details. It is sufficient if the two confessions are substantially the same and consistent on the major elements of the crime, particularly the slayings.[13] Here, the statements of Felton and Kirksey are in harmony as to the basic material events; they clearly interlock as to

motive, plotting and execution of the crimes.

Our Court of Appeals consistently has held that upon a joint trial, the *Bruton* rule [14] is not violated "[w]here the jury heard not only a co-defendant's confession but the defendant's own confession," since in that circumstance "no such 'devastating' risk attends the lack of confrontation as was thought to be involved in *Bruton*." [15] This view, shared by most circuits, recently has been upheld by a plurality of the Supreme Court in *Parker v. Randolph.*[16] The precise issue there decided is four-square with that presented by the instant case, to wit, as stated by Mr. Justice Rehnquist, "whether *Bruton* requires reversal of a defendant's conviction when the defendant himself has confessed and his confession 'interlocks' with and supports the confession of his codefendant." The holding was that the admission at a joint trial of such interlocking confessions with proper instructions did not infringe upon the right of confrontation secured under the Sixth Amendment.

The continuing vitality of *Bruton* was recognized but the Court noted that its underlying rationale was not applicable to every case. That rationale is that at a joint trial the admission of extrajudicial statements of a non-testifying codefendant has the potential of such devastating impact upon a *non-confessing defendant* that potential prejudice cannot be removed by limiting instructions with the consequence that his right to a fundamentally fair trial may be impaired. But Mr. Justice Rehnquist went on to say:

12. *United States ex rel. Ortiz v. Fritz*, 476 F.2d 37, 39 (2d Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed.2d 482 (1973).

13. *United States ex rel. Stanbridge v. Zelker*, 514 F.2d 45, 49 (2d Cir.), *cert. denied*, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); *United States v. De Berry*, 487 F.2d 448 (2d Cir. 1973); *United States ex rel. Duff v. Zelker*, 452 F.2d 1009 (2d Cir. 1971), *cert. denied*, 406 U.S. 932, 92 S.Ct. 1807, 32 L.Ed.2d 134 (1972).

14. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

15. *United States ex rel. Catanzaro v. Mancusi*, 404 F.2d 296, 300 (1968), *cert. denied*, 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970); *United States v. Dizdar*, 581 F.2d 1031 (2d Cir. 1978); *United States ex rel. Stanbridge v. Zelker*, 514 F.2d 45, 49 (2d Cir.), *cert. denied*, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); *United States ex rel. Duff v. Zelker*, 452 F.2d 1009 (2d Cir. 1971), *cert. denied*, 406 U.S. 932, 92 S.Ct. 1807, 32 L.Ed.2d 134 (1972).

16. 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979).

[T]he same cannot be said, however, when the defendant's own confession—'probably the most probative and damaging evidence that can be admitted against him,' . . . —is properly introduced at trial. The defendant is 'the most knowledgeable and unimpeachable source of information about his past conduct,' . . . and one can scarcely imagine evidence more damaging to his defense than his own admission of guilt. Thus, the incriminating statements of a codefendant will seldom, if ever, be of the 'devastating' character referred to in *Bruton* when the incriminated defendant has admitted his own guilt. The right protected by *Bruton*—the 'constitutional right of cross-examination,' . . . —has far less practical value to a defendant who has confessed to the crime than to one who has consistently maintained his innocence.[17]

The case here is even stronger than *Parker* to support the non-applicability of the *Bruton* doctrine. Here Felton testified seeking to vitiate the force of his inculpatory statements by a denial of their verity. That the jury rejected his disavowal of his oral and written confessions did not give rise to a violation of his right of confrontation. Indeed, the confrontation clause, while of great importance in assuring an accused a fundamentally fair trial, has never been woodenly applied to bar every extrajudicial statement.[18] Petitioner's counsel urges that *Parker* has not conclusively resolved the issue of whether the *Bruton* rule precludes the use at trial of a non-testifying codefendant's confession when the defendant himself has confessed, pointing out that only four justices held that *Bruton* was not

violated, whereas, according to him, four were of the view that it was, and that the majority vote was obtained by Mr. Justice Blackmun's concurrence which was based on the harmless error doctrine as explicated in *Harrington v. California.*[19] Accordingly, petitioner's counsel presses that *Bruton* be applied in the instant case. However one may view that contention, the short answer is that this Court is bound by the rulings of our Court of Appeals,[20] and under its repeated authorities on this subject, this case is beyond *Bruton*. Moreover, even were it assumed, contrary to the foregoing, that *Bruton* was applicable and that petitioner's conviction was obtained in violation of that rule, this Court, based upon its word-by-word study of the entire record, including not only the trial testimony but that taken over a four-day period with respect to the pretrial motions, is fully persuaded that the claimed error was harmless beyond a reasonable doubt. The detailed review of the record fully supports the trial court's observation there was "strong evidence of defendant's guilt." Once the jury rejected petitioner's disclaimer of his confession, and upon its face the disavowal does appear most implausible, the evidence that he committed the murders was most powerful. Perhaps the strongest proof that the jury convicted Felton upon his own confession of guilt and not that of his codefendant is that Kirksey in his final confession implicated Felton only in the Simon murder, whereas Felton confessed to and was convicted of all three, the Simon, Doyle and Bloswick murders.

The petition for a writ of habeas corpus is denied.

---

**17.** *Id.* at 72, 99 S.Ct. at 2139 (quoting from *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J., dissenting)).

**18.** *See Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979); *Dutton v. Evans,* 400 U.S. 74, 80, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Heike v. United States,* 192 F. 83, 90 (2d Cir. 1911), aff'd, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913); *Montgomery v. Fogg,* 479 F.Supp. 363, 79 Civ. 3626 (S.D.N.Y. Oct. 16, 1979).

**19.** 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

**20.** *See, e. g., United States v. Jenkins,* 349 F.Supp. 1068, 1072 (E.D.N.Y.1972), *app. dismissed,* 490 F.2d 868 (2d Cir. 1973), aff'd, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975); *United States ex rel. Johnson v. Zelker,* 339 F.Supp. 227, 230 (S.D.N.Y.1971); *Hoover v. Allen,* 241 F.Supp. 213, 229 (S.D.N.Y.1965).