### UNITED STATES ex rel. Victor JOHNSON, Petitioner,

v.

### Michael P. LANE, Respondent.

#### No. 85 C 7093.

United States District Court, N.D. Illinois, E.D.

May 16, 1986.

James H. Reddy, Public Defender of Cook County, Chicago, Ill., for petitioner.

Joan Fickinger, Ill. Atty. Gen., Chicago, Ill., for respondent.

### MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This petition for a writ of habeas corpus is before the court on cross-motions for summary judgment pursuant to Fed.R. Civ.P. 56. Petitioner Victor Johnson is a prisoner in the custody of respondent at the Joliet Branch of the Illinois State Penitentiary as a result of his conviction after a jury trial for murder, rape, deviate sexual assault, armed robbery, and aggravated kidnapping. The Illinois Appellate Court upheld his conviction, though his case was

remanded for resentencing. *See People v. Johnson*, 132 Ill.App.3d 1, 87 Ill.Dec. 329, 476 N.E.2d 1321 (1st Dist.1985). The Illinois Supreme Court denied his petition for leave to appeal. Ill. Official Reports (106 Ill.2d, No. 12) 21, Nos. 61727, 61800 cons. (May term 1985) (published June 12, 1985). This court has jurisdiction under 28 U.S.C. § 2254.

Petitioner asserts that his sixth amendment right to confrontation, as construed in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), was violated because a non-testifying codefendant's confessions implicating petitioner were introduced at their joint trial. Petitioner took the stand, denied his guilt, and repudiated his own confessions on the ground that he made them under coercion and under promises of special treatment. However, the trial court had found earlier that petitioner's confessions were voluntarily made.

Respondent asserts that the codefendant's confessions interlocked with petitioner's own, and that the codefendant's confessions were accordingly *per se* admissible in a joint trial under the plurality precepts in *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), as long as the jury was instructed to consider the codefendant's confessions against the codefendant only. Such an instruction was given in the instant case. Petitioner responds, however, that the *per se* rule of *Parker v. Randolph* is inapplicable in the context of a repudiated confession.

For the reasons explained herein, the court holds that the codefendant's confessions interlocked with petitioner's, that the *per se* rule of *Parker* does not apply, but that any error in their introduction was harmless beyond a reasonable doubt. Accordingly, the petition is denied.

**Facts**

On July 31, 1979, a then-unknown woman was found dead of a shotgun wound in a Harvey, Illinois alley. Not until August 5, 1979, was she identified as Fannay Mae Gause. Meanwhile, on August 2, Darnell Jones was involved in a traffic accident in Oak Park, Illinois, and was arrested after a shotgun was found in his car. During police station interrogation, Jones told police he had witnessed a Harvey shooting two days earlier. In response to the Oak Park police's call, Harvey Detective Coleman McCarthy then arrived and questioned Jones. On the basis of his interview with Jones, McCarthy subsequently arrested petitioner, and petitioner then made certain statements of his own.

Prior to trial of petitioner and Jones, both defendants unsuccessfully moved to suppress their respective confessions and to sever their joint trial. Neither defendant testified at the suppression hearing. On the motion to sever, defense trial counsel argued that introduction of each defendant's confessions during a joint trial would violate the other defendant's *Bruton* confrontation rights. The prosecutor responded that each defendant's confessions interlocked with the other's and were thus admissible as an exception to the *Bruton* rule.

Because the issues of the case are critically affected by the interplay of petitioner's and his codefendant's respective sets of statements as published to the jury and testified to at trial, the court relates the statements and testimony in some detail.

**A. Detective McCarthy's Testimony and Defendants' Statements.**

At trial, Detective McCarthy testified that co-defendant Jones gave him an oral statement on August 2 and a written statement on August 8, which varied in minor respects but in essence told the following tale of crime. The written statement was entered into evidence. In Jones's version of events, he and petitioner were riding in a stolen car on July 31 and looking for a robbery victim. They stopped the car near 87th Street and King Drive in Chicago, where as a ruse Jones pretended to ring a doorbell and then, at the point of a .25-caliber automatic revolver, forced a woman passerby to enter the car. He then forced her to give up thirty cents, which was all the money she had, and he handed it to

petitioner, who was at the wheel. With the three of them in the car, petitioner then drove the car down 87th Street while Jones sexually assaulted the woman, and then forcibly engaged her in vaginal intercourse, anal intercourse, and fellatio.

During this time, petitioner drove the car onto the Dan Ryan Expressway and then south to 127th Street, where he left the highway but promptly reentered it, and continued to Sibley Boulevard, where he again exited. After this second exit, petitioner drove into a Harvey alley while the woman was still being forced to fellate Jones. After she stopped, petitioner began sexual intercourse with her, but eventually she was allowed to dress herself. (In his August 8 written statement, which was entered into evidence and published to the jury, Jones elaborated on petitioner's role by saying that petitioner had also had anal intercourse with the woman and that it was petitioner who had opposed releasing her while Jones had favored letting her go.)

The three of them got out of the car. The woman began to scream for help, pleaded for her life, promised not to call the police, and spoke of her three children. Petitioner slapped the woman, told her to shut up, and then shot her in the chest with a shotgun when she continued to scream and plead. Petitioner then dropped the shotgun, Jones picked it up, the two of them drove back to Chicago, and petitioner sawed off the shotgun barrel two days later.

McCarthy testified that after obtaining the address and physical description of petitioner from Jones, he arrested petitioner as the latter rode away from his house. At the Harvey police station, petitioner made an oral statement regarding the crimes. McCarthy made notes of what petitioner told him and then had the notes transcribed into a typewritten statement that petitioner signed. A second transcript based on an assistant state's attorney's subsequent interrogation of petitioner was prepared and signed by petitioner later on the same night. Both the typewritten statement and the transcript were entered into evidence.

## B. Similarities and Differences Between Defendants' Statements.

The specific content of petitioner's statements can best be described by comparing them with Jones's statements. McCarthy's testimony shows that the details in Jones's statements were largely paralleled by those in petitioner's first (oral) statement, including a reference to the woman's three children. Significant differences were as follows: (1) petitioner did not mention receiving the woman's thirty cents from Jones; (2) petitioner stated that, except for kissing her and feeling her breasts (which he said felt empty), he had no sexual relations with the woman; and (3) petitioner stated that Jones opposed releasing the woman and that Jones as well as petitioner had slapped her as she was screaming. In addition, petitioner's oral statement contained numerous details not provided by Jones, such as the woman having carried a grocery bag and having lost a shoe in the initial struggle, petitioner's familiarity with Harvey because of his girlfriend's residing there, and petitioner's having removed the ammunition from the gun after returning home and having thrown it onto a neighbor's roof from which it rolled onto the ground.

Petitioner's first written statement contained most of the details in his oral statement as well as numerous others. This written statement quoted the woman as having referred three times to her three children. This statement described the woman's clothing, the alley where the murder occurred, the exit from the expressway to go to Harvey, and the Harvey street on which petitioner's girlfriend lived. In this statement, petitioner said he had forced Jones to cease intercourse with the woman after the woman had begun to bleed and (contrary to Jones's statement) that Jones had begun anal intercourse only after arriving at the alley. Petitioner mentioned that he had burned part of the fatal shell after returning home before throwing the rest of it away, and that the the shotgun

was a .12 gauge Montgomery Ward weapon.

McCarthy testified that petitioner's second written statement, in the form of questions and answers by an assistant state's attorney and petitioner, was taken and transcribed by a court reporter late on the night of petitioner's arrest, and was then signed by petitioner. This statement contained the following additional details not in petitioner's earlier statements: the stolen car was a two-door brown Ford LTD with a vinyl top; the woman was black; and the pistol was a .25–caliber automatic. Jones's first statement had also mentioned this latter detail.

In this second written statement, petitioner again mentioned that the woman had lost a shoe, and again declared that the woman had spoken of her three children when threatened in the car and before being shot. Petitioner again mentioned leaving the expressway early at 127th Street, and gave a detailed description of stoplights and the direction of turns after exiting the expressway. Petitioner added that he did not have sexual intercourse with the woman and had not intended to do so, because he was sore from having had intercourse with his girlfriend on the previous morning. In this statement, petitioner said that after returning home, he removed the round that had been fired, burned the rear part off, and threw the cap onto the neighbor's roof. During this statement, petitioner said that he had seen no brand name on the shotgun but "was told" that the label said "Montgomery Ward." (R. 444).

In this final written statement, petitioner also said that he had attended "CVS" (Chicago Vocational High School) for two years but had been expelled after getting into trouble with the principal. He added that he had tried to enter Corliss High School at 103d Street and Cottage Grove Avenue but had been refused admission.

In summary, the chief differences between petitioner's statements and those of Jones, apart from petitioner's added detail, lay in petitioner's denial of having had sexual relations himself with the victim, his disagreement with Jones as to who had treated the victim more unfavorably in the last moments of the criminal episode, and his failure to acknowledge having received the thirty cents in robbery proceeds from Jones. As will be seen, the wealth of detail in petitioner's statements allowed the prosecution considerable opportunity to impugn his credibility when he repudiated the use statements at trial.

### C. The Corroborating Evidence.

In addition to hearing McCarthy's testimony and the confessions of the two codefendants, the jury was apprised of the following facts. At approximately 3:00 a.m. on July 31, 1979, Pearl Mays was driving down an alley in Harvey when she discovered the body of a black female. Ms. Mays called the police (R. 261–62), and Officer Sylvester Jones of the Harvey Police Department arrived at the scene. Officer Jones observed that the woman had sustained a large shotgun wound and that there was only one shoe to be found in the vicinity of the woman's body. (R. 267–68). Officer Jones knew the wound to be a shotgun wound due to pellets found around the wound and on the woman's body. (*Id.*) Numerous pictures of the victim's body were entered into evidence. (R. 263–64).

The jury was also shown a twelve gauge Ward's shotgun and a twenty-five caliber starter pistol which were found in Jones's car, (R. 289, 304–05), and a matching shotgun barrel stock found somewhat later in a south side field. Finally, the jury heard from Harvey Police Officer Ron Ziolkowski that on August 3, 1979, he went to petitioner's address and located three spent shotgun shells of the Winchester Western make. (R. 474–77). Previous testimony had established that Winchester Western shells were consistent with the live shell found in the sawed-off shotgun and the pellets found in the victim's body. (R. 326–28).

### D. Petitioner's Testimony.

When petitioner took the stand, he admitted to having made the earlier confessions

but disclaimed their accuracy. According to petitioner, McCarthy initially threatened him with a gun when petitioner failed to identify himself after being arrested. In the car, McCarthy questioned him about a murder, showed him a picture of the victim, and told him he knew petitioner had been in a mental hospital. Petitioner himself had not yet told McCarthy who he was or that he had been in a hospital. At the police station, McCarthy told him that Darnell Jones had made a statement implicating petitioner and that petitioner could either cooperate and be sent to a hospital or spend the rest of his life in the penitentiary and perhaps be electrocuted. After going over Jones's story several times with petitioner, McCarthy finally persuaded petitioner to give in and cooperate.

Petitioner claimed he signed the false statement "because [McCarthy] told me he was going to get me some help and I was afraid, because he told me I be in the penitentiary the rest of my life." (sic) After returning to the lockup and thinking about the dead woman's photo, petitioner became upset and tried to hang himself with the shirt he was wearing. He had tried to kill himself on other past occasions. The shirt tore. McCarthy returned and asked him what he was doing, and then McCarthy took him back to his office, told him to sign the statement and not to worry, that the police were going to get him some help, and that the state's attorney would arrive soon, at which time he should continue to cooperate and say that the police had not promised him anything. A police photograph of himself, which had previously been offered as evidence by the prosecution, showed him wearing a red coat that McCarthy gave him after petitioner had torn his shirt in the suicide attempt.

Petitioner's testimony continued that when the assistant state's attorney arrived, petitioner answered his questions in accordance with what McCarthy and he had rehearsed. When asked the unrehearsed question about his high school career, he made up an untrue answer, the fact being that he had never attended Chicago Vocational High School. His statements regarding the crimes were all untrue except for the detail about being sore from having had sex with his girlfriend on July 31, 1979. Petitioner claimed he was asleep at home on the night of July 31, 1979, and knew he was not in Harvey.

On cross-examination petitioner denied that he had ever had a girlfriend in Harvey and knew his way around Harvey. He said McCarthy had never told him to say that the woman's breasts felt empty; he had made that statement on the basis of the picture of her wound. He said McCarthy had not told him to say he threw the shotgun shell onto the lot next door but that he and his stepfather had in fact disarmed and thrown away a bag of shells there about one week before in order to prevent his brother from using them.

Asked why one of the recovered shells had been grossly deformed and was of the Winchester Western make, he said that other shells in the lot had been similarly treated and could have been found by the police. Asked whether McCarthy had told him the victim had three children, he said he did not know, that some of the contents of his statements were rehearsed and others he had to make up, and that McCarthy had not rehearsed the number of children. Previous testimony had shown that the murdered woman in fact had three children.

On cross-examination, petitioner testified that he had made up the story about CVS because he thought it would make his statement look better, though he now realized it made it look worse for him. In his direct testimony, petitioner said that after completing the eighth grade and starting the ninth in a remedial school, he had tried to get into CVS and Corliss but could not do so because he was "in and out of" Chicago Read and Tinley Park mental health centers at that time. It was at one of these centers where he met Darrell Jones. Petitioner also testified that he had related all the details about the trip to Harvey because McCarthy had told him about them, using Jones's statement as a

basis, and not because of any independent familiarity of his own with the route. He did, however, acknowledge knowing how to get to Harvey.[1]

In closing argument, the prosecution attacked petitioner's allegation that he had confessed because of a promise to be sent to a mental hospital, asking: "If a man didn't do anything, what kind of choice is that?" The prosecution emphasized that neither petitioner nor his codefendant could have known from the police how many children to quote the murdered woman as claiming, because at the time of the defendants' original confessions the police were still unaware of the victim's identity. The prosecution attacked petitioner's statement that he had never been to Harvey, pointing out the specific route described in his confessions; challenged petitioner's statement that he had only touched the victim's breast but had not had intercourse with her, adding that on an accountability theory the prosecution need not prove petitioner's physical participation in each act charged; and referred to the deformed shell found next to petitioner's house. The prosecutor did *not* stress the similarities between Jones's and petitioner's statements as a ground for disbelieving the latter's testimony, although he did point out the discrepancies between the two confessions. (Tr. 619–20).

## Legal Discussion

### A. Per Se Admissibility of Interlocking Confession.

The basic issue in this case concerns the extent to which the sixth amendment right to confront adverse witnesses precludes the prosecution from introducing a codefendant's confession when (1) the defendant and codefendant are tried jointly, (2) the codefendant's confession tends to implicate the defendant, and (3) the codefendant cannot be cross-examined because he does not take the stand. In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that the admission in a joint trial of the "powerfully incriminating" statements of a nontestifying codefendant impermissibly infringed the other defendant's right of confrontation. *Id.* at 135–136, 88 S.Ct. at 1627–1628. Though acknowledging that "[a] defendant is entitled to a fair trial but not a perfect one," the Court held that cautionary instructions to use the out of court confession only against the confessor could not cure the defect. *Id.* at 137, 88 S.Ct. at 1628.

In *Harrington v. California*, 395 U.S. 250, 253–54, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), the Court held that a violation of the *Bruton* rule, in light of other "overwhelming" evidence of guilt, might be harmless beyond a reasonable doubt and thus fail to constitute reversible error. This harmless error approach characterized the Court's later decision in *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), when use of a non-testifying codefendant's statements was approved because they merely interlocked with and corroborated parts of the defendant's own detailed confession and the other "independent" and "overwhelming" evidence. *Id.* at 431, 92 S.Ct. at 1059.

Presented again with a case of interlocking confessions in *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), a four-Justice plurality of the Court reasoned that when a defendant has admitted his own guilt, use of his codefendant's confession implicating him at their joint trial "will seldom, if ever, be of the devastating character referred to in *Bruton*" and that the "admission of interlocking confessions with proper limiting instructions" is *per se* constitutional. *Id.* at 73–74, 99 S.Ct. at 2139–40. (Rehnquist, J., with Burger, C.J., Stewart, J., and White,

---

1. The court notes that presentence reports indeed show petitioner to have been seen on numerous occasions in psychotherapeutic settings, including those at Chicago Read and Tinley Park, but no evidence other than petitioner's own testimony was offered to show that his codefendant had ever known him there or that the codefendant or the police had ever known of petitioner's psychotherapy. The same presentence reports note professional opinions that petitioner displayed marked manipulativeness in dealing with adverse facts.

J.). The Court reasoned that the sixth amendment right of confrontation "has far less practical value to a defendant who has confessed to the crime than to one who has consistently maintained his innocence," and that "[s]uccessfully impeaching a codefendant's confession on cross-examination would likely yield small advantage to the defendant whose own admission of guilt stands before the jury unchallenged." *Id.* at 73, 99 S.Ct. at 2139. Thus, "when the defendant's own confession is properly before the jury ... the constitutional scales tip the other way" than they had in *Bruton. Id.* at 74, 99 S.Ct. at 2140.

The four other *Parker* Justices—including Justice Blackmun, who concurred in the plurality's judgment and thus made it the judgment of the Court—felt that each case in which a non-testifying codefendant's interlocking confession was introduced should be analyzed for harmlessness of any *Bruton* error and not treated as immune from the *Bruton* rule. Because of the posture of the particular case, three of these Justices not only rejected the prevailing plurality's reasoning, *id.* at 82–91, 99 S.Ct. at 2144–48, but were unable to find the *Bruton* error at issue harmless. *Id.* at 81–82, 99 S.Ct. at 2143–44. (Stevens, J., with Brennan and Marshall, JJ., dissenting). Justice Blackmun, however, concurred in the *Parker* judgment because, while he "would not adopt a rigid *per se* rule," *id.* at 79, 99 S.Ct. at 2142, he felt that any *Bruton* error in the case had indeed been harmless beyond a reasonable doubt. *Id.* at 77, 99 S.Ct. at 2141.

Respondent contends that the prevailing plurality opinion in *Parker* established the rule that, notwithstanding *Bruton,* a non-testifying codefendant's confession is always admissible in a joint trial as long as it interlocks with a confession by defendant that is already properly before the jury and the jury is instructed to consider the interlocking confession solely as to the codefendant. Since petitioner's confession was properly before the jury and an appropriate instruction had been given, respondent argues that petitioner's confession was admissible *per se.* Petitioner contends, how-

ever, in reliance on Justice Blackmun's decisive *Parker* concurrence, that the *Parker* case stands only for the rule that a harmless error analysis must be done before introduction of an interlocking confession can be approved, and that under such an analysis in the case at bar, use of the codefendant's confession should be held reversible error.

Whether *Parker* stands for a rule that interlocking confessions are admissible *per se* has not been decided by the Court of Appeals for this circuit. Several Seventh Circuit decisions, however, have at least alternatively applied a harmless error test to codefendants' interlocking confessions even when defendants did not repudiate their own confessions. *See United States ex rel. Colon v. DeRobertis,* 774 F.2d 801, 806 (7th Cir.1985); *Riner v. Owens,* 764 F.2d 1253, 1260 (7th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1282, 89 L.Ed.2d 589 (1986); *Montes v. Jenkins,* 626 F.2d 584, 587–88 (7th Cir.1980); *United States v. Spinks,* 470 F.2d 64, 66 (7th Cir.), *cert. denied,* 409 U.S. 1011, 93 S.Ct. 456, 34 L.Ed.2d 305 (1972). In addition, one decision in this circuit has strongly suggested in dictum that when (as here) a defendant has repudiated his confession, introduction of the codefendant's interlocking confession may be reversible error unless there is sufficient additional corroborating evidence of the defendant's guilt. *United States v. Fleming,* 594 F.2d 598, 603–04 (7th Cir.), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979).

A harmless error test in consonance with Justice Blackmun's *Parker* concurrence is apparently applied in the Eighth Circuit. *See, e.g., United States v. Iron Thunder,* 714 F.2d 765, 771 (8th Cir.1983) (alternative holding); *United States v. Parker,* 622 F.2d 298, 301 (8th Cir.1980), *cert. denied sub nom* 449 U.S. 851, 101 S.Ct. 143, 66 L.Ed.2d 63 (1980) *Todd v. United States,* (stating that harmless error analysis continues to be preferable to *per se* approach even after *Parker v. Randolph.*) The Second Circuit, by contrast, has treated the interlocking confessions situation as an

"exception to the *Bruton* rule" and not as harmless error notwithstanding the fact "that a defendant takes the stand and denies his guilt, thus implicitly repudiating his inculpatory admissions." *Tamilio v. Fogg,* 713 F.2d 18, 20–21 (2d Cir.1983), *cert. denied,* 464 U.S. 1041, 104 S.Ct. 706, 79 L.Ed.2d 170 (1984). However, the Second Circuit apparently adopted a *per se* approach prior to *Parker v. Randolph* whereas the Seventh Circuit apparently did not. *Compare United States ex rel. Dukes v. Wallack,* 414 F.2d 246, 247 (2d Cir.1969) *with United States v. Fleming,* 594 F.2d 598, 602–03 (7th Cir.), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979). Given the state of the law in this circuit, the court believes that *Parker v. Randolph* requires a harmless error analysis to be made before introduction of a codefendant's interlocking confession at a joint trial can be sustained.

This view is strengthened by the Supreme Court's announcement in *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds'...." *Id.* at 193, 97 S.Ct. at 993 (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). In *Parker v. Randolph,* the "narrowest grounds" were presumably provided by Justice Blackmun's concurrence, which joined in the judgment on harmless error grounds and not on the broader *per se* theory advanced by the prevailing plurality. Justice Blackmun's view thus "constituted the holding of the Court and provided the governing standards." *Marks,* 430 U.S. at 194, 97 S.Ct. at 994.

Were this court nevertheless to adopt the *Parker* plurality's approach as a *per se* rule that would generally allow use of interlocking confessions, such a rule still would not logically reach the present case. The *Parker* respondents failed to take the

stand and challenge their confessions, and the plurality's opinion specifically noted that "[s]uccessfully impeaching a codefendant's confession on cross-examination would likely yield small advantage to the defendant *whose own admission of guilt stands before the jury unchallenged.*" *Parker,* 442 U.S. at 73, 99 S.Ct. at 2139 (emphasis supplied). The plurality reasoned that "the incriminating statements of a codefendant will seldom, if ever, be of the 'devastating' character referred to in *Bruton* when the incriminated defendant has admitted his own guilt." *Id.* The corollary of this reasoning is that when a defendant *has* denied his guilt by repudiating a confession, a codefendant's interlocking confession that is unrelieved by the opportunity to cross-examine may very well be "devastating" to his case.

The Seventh Circuit recognized in dicta in *United States v. Fleming* that non-repudiation can be critical to the weight given a confession and thus to the harmlessness of an interlocking confession. 594 F.2d at 603–04. Although the Second Circuit has followed a *per se* approach for interlocking confessions even when a defendant has repudiated his own confession, all of the decisions applying that rule did so in the context of additional corroborating evidence which the courts found to render any possible *Bruton* violation harmless beyond a reasonable doubt. *See Tamilio,* 713 F.2d at 21; *Dukes,* 414 F.2d at 247; *Felton v. Harris,* 482 F.Supp. 448, 456 (S.D.N.Y. 1979). This court concludes that regardless of how the teaching of *Parker v. Randolph* is characterized, it cannot realistically be viewed as immunizing an interlocking confession from harmless error scrutiny when the principal confession has been repudiated at trial.

### B. Whether the Alleged Bruton Error Was Harmless.

In analyzing for harmless error in the present case, the court must first determine the extent to which codefendant Jones's confession truly interlocked with

petitioner's repudiated one. To interlock, confessions "need not be absolutely identical ... but only ... be 'substantially the same and consistent on the major elements of the crime involved.'" *United States v. Dizdar*, 581 F.2d 1031, 1038 (2d Cir.1978) (quoting *United States ex rel. Duff v. Zelker*, 452 F.2d 1009 (2d Cir.1971)). In this circuit, statements have been held to be interlocking because there was "no doubt that the same crimes were described" even though "the admissions were not absolutely identical and some of the descriptive details were garbled in the retelling." *United States v. Fleming*, 594 F.2d 598, 604 (7th Cir.), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979). Even when statements not only dealt with different aspects of a crime but also contradicted each other as to the time of its commission, they were held sufficiently interlocking because "[a]s to motive, plot and execution ... they [were] essentially the same." *United States ex rel. Ortiz v. Fritz*, 476 F.2d 37, 39 (2d Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed.2d 482 (1973). In *Parker v. Randolph*, the confessions interlocked because they "'clearly demonstrated the involvement of each, as to crucial facts such as time, location, felonious activity, and awareness of the overall plan or scheme.'" 442 U.S. at 67–68, 99 S.Ct. at 2136 (quoting from the Tennessee Supreme Court's unpublished opinion in the state appeal).

■ In this case, petitioner's confession was substantially identical to Jones's on the time, manner, plot, and execution of the crime. The principal discrepancy between the present petitioner's confessions and those of his codefendant involved the question whether petitioner himself engaged in sexual activity with the victim or directly received the proceeds of robbing her. However, petitioner was indicted on an accountability theory under Illinois law, *see* Criminal Code of 1961, §§ 5–2, 5–3, Ill.Rev. Stat. ch. 38, ¶¶ 5–2, 5–3 (1985), as was Jones on the murder charge. The jury found both defendants guilty of both crimes. Thus, if with criminal intent he aided or abetted his codefendant's sexual

assault and armed robbery, he was equally liable to conviction, and petitioner has not argued to this court that the *Bruton* error went only to the rape or robbery charges.

By offering nothing to disprove his criminal intent or his abetment, petitioner's own confessions sufficiently interlocked with the codefendant's regardless of whether petitioner's admitted activity corresponded in every physical particular to that of the codefendant. The fact that, after all crimes but the murder had occurred, petitioner's confessions would depict him as more leniently inclined toward the victim than was his codefendant does not alter the fact that petitioner admitted having aimed and fired the fatal shot. The interlock is complete up to and including the moment of the victim's death. *See also Parker v. Randolph*, 442 U.S. at 67, 99 S.Ct. at 2136 (interlocking confessions allowed where robbery participation sustained felony murder convictions); *Tamilio v. Fogg*, 713 F.2d 18, 21 (2d Cir.1983) (proof of appellee's participation in fatal robbery established his guilt of felony murder though his statement had not acknowledged that he did the actual killing).

If Jones's confession had been merely cumulative of petitioner's own unchallenged confession, it would be difficult to contend that its introduction could have prejudiced petitioner to the point of constituting reversible error. In such a case, as was noted in *United States v. Fleming*, "the devastating risk that the jury will be unable to disregard the co-defendant's statement is not present because the defendant's own similar statement is in evidence," 594 F.2d at 603, and petitioner "would still be faced with his own admission even if the other's admission was excluded." *Id.* at 604. Moreover, as in *Schneble v. Florida*, petitioner's confessions were "minutely detailed and completely consistent with the objective evidence." Because Jones's confessions were substantially similar to petitioner's and because in terms of legal accountability they were virtually identical, the court concludes that any *Bruton* error was harmless unless

the joint introduction of confessions prejudiced petitioner's attempted repudiation. Accordingly, the court turns to that issue.

The Seventh Circuit has repeatedly recognized that when a confession is repudiated, a particularly careful balance must be struck between the *Bruton* rule and the interlocking confession exception. For example, in *Fleming*, which involved unrepudiated statements, the court qualified its characterization: *"Where the statement is not repudiated*, it may be powerful evidence of guilt...."* 594 F.2d at 603 (emphasis added). In *Montes v. Jenkins*, 626 F.2d 584, 589 (7th Cir.1980), introduction of a codefendant's identical statement was harmless when "[n]o significant doubt was cast at trial on Montes' confession," "the jury had no reason to disbelieve it," there was no repudiation, and Montes did not "demonstrate any fact or circumstance that seriously cast doubt on the veracity of that confession." Indeed, the prevailing *Parker* plurality couched its views in terms of unchallenged confessions. 442 U.S. at 73–74 at n. 7, 99 S.Ct. at 2139–40 at n. 7. However, the *Fleming* court also noted that even when a non-testifying codefendant's statement is admitted as against a defendant's denial of ever having confessed himself, "additional corroborating evidence may make the error harmless beyond a reasonable doubt." 594 F.2d at 603, citing *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). If that is so in the case of a defendant who denies having confessed, it logically follows that a similarly situated defendant who admits having confessed but denies the accuracy of his statement cannot escape the impact of the harmless error analysis.

A case remarkably like the present one is *Felton v. Harris*, 482 F.Supp. 448 (S.D.N.Y.1979). In that case, the defendant had been approached by the police after being implicated by his codefendant, confessed in great detail to the crime, but then testified before the jury that his confession was false and that he simply parroted what the police told him to say. *Id.* at 454. The jury was shown his own confession and that of his codefendant, who had not taken the stand. In his petition for habeas relief, the defendant claimed that admission of his codefendant's confession violated *Bruton.*

Applying the Second Circuit's *per se* approach to interlocking confessions, Judge Weinfeld ruled that *Bruton* was not violated. He noted, however, that even were it assumed that *Bruton* applied to interlocking confessions, the error was harmless beyond a reasonable doubt. Judge Weinfeld in particular noted that the petitioner admitted having made the incriminating confession, that the confession matched the independent corroborative evidence before the jury, and that although the codefendant's confession implicated petitioner in only one out of three murders to which the petitioner had confessed, petitioner was convicted of all three. *Id.* at 454–456. As the Judge noted, "Once the jury rejected petitioner's disclaimer of his confession, and upon its face the disavowal does appear most implausible, the evidence that he committed the murders was most powerful." *Id.* at 456.

■ The present case also involves a confession supported by corroborative evidence and an inherently implausible repudiation of that confession. Petitioner claimed that his confession had been "coached" by McCarthy, yet admitted at trial that certain details were of his own making, in particular his statement about the victim's having three children and about his having thrown the deformed shotgun shell onto his neighbor's roof. The victim indeed had three children, and the shotgun shell found next to petitioner's house was of a brand consistent with the pellets recovered from the victim's body. Petitioner's in-court testimony was further unbelievable in that he denied on cross-examination knowing his way around Harvey even though his confession gave a detailed description of stoplights and turns he took after exiting the expressway at 127th Street. Finally, petitioner's confession contained certain details about the death not in Jones's confession which would have been known only to the murderer.

Thus, as in *Felton,* the evidence of petitioner's guilt was "most powerful," and there is little possibility that the jury might have tended to believe petitioner's recantation and acquitted. The only portion of petitioner's confessions even remotely tending to bolster his theory of police coaching was the exchange between him and the police questioner as to the brand name on the shotgun. Petitioner's reply that he had been "told" the name was Montgomery Ward could conceivably mean that he had been told that detail by a police questioner as opposed to his codefendant, but this point was not even argued to the jury (nor to this court). Such ambiguity is thin support for his story of coaching, which was otherwise totally without corroboration.

More important for our purposes, however, is the interplay between Jones's confession and petitioner's testimony. Even were there a reasonable possibility that the jury could have believed petitioner's repudiation, there is no reasonable possibility that the introduction of Jones's confessions might have contributed to their decision to disbelieve petitioner's testimony. Petitioner did not deny having made his confessions, but argued that the police coerced his confession and rehearsed his answers using Jones's first confession as a script. It was petitioner, and not the prosecutor, who injected Jones's confession into his own case.

Petitioner should thus not be heard to complain that Jones's confession unfairly hampered his defense: had the men been tried separately, petitioner would still have needed Jones's confession to corroborate his story of repudiation. Each time a detail in Jones's confession matched a detail in petitioner's own, his defense theory was bolstered—*if* the jury was inclined to believe the repudiation. The repudiation's lack of persuasiveness cannot be reasonably traced to the interlocking confessions, since parallels between the two confessions were necessary for petitioner's testimony to be believed at all. Indeed petitioner must have implicitly recognized this by putting Jones's confession into issue in his own case and testifying as he did.

Under all these circumstances, the jury logically must have viewed petitioner's attempt at repudiation to be inherently incredible without regard for the incriminating character of Jones's parallel confessions. Once the jury made that determination, petitioner's own confession—"probably the most probative and damaging evidence that can be admitted against him," *Bruton,* 391 U.S. at 139, 88 S.Ct. at 1629 (White, J. dissenting)—would have rendered Jones's confessions "insignificant by comparison" in determining petitioner's guilt on the substantive charges. *Parker,* 442 U.S. at 71, 99 S.Ct. at 2138.

The court notes further in this regard that the prosecutor did not take advantage of petitioner's trial testimony to invoke Jones's statements as evidence of petitioner's guilt in closing argument. The prosecutor stressed the unbelievability of petitioner's testimony and the way his confession matched the known evidence about the murder. The only time Jones's confession was mentioned in connection with petitioner's testimony was to point out the numerous details in petitioner's confession which were absent from the statements made by Jones; such argument was proper response to petitioner's contention that Jones's statement had been the script from which McCarthy coerced petitioner's confession, and was in any event not objected to at trial.

Accordingly, the respondent's motion for summary judgment is granted, and the petition for a writ of habeas corpus is denied.

It is so ordered.